1

2

3

4                    UNITED STATES  DISTRICT COURT

5                       Northern District of California

6

7   MITCHELL SMITH,                            No.  C 12-2642 MEJ

8                    Plaintiff,                **ORDER RE: DEFENDANT'S
                                               MOTION FOR SUMMARY**
9        v.                                    **JUDGMENT**

10  OVERLAND CONTRACTING, INC.,
                                               **(Docket No. 37)**
11                   Defendant.
    _____/

12

13                          **INTRODUCTION**

14       Plaintiff Mitchell Smith brings this action for damages related to his employment as a

15  construction manager at Defendant Overland Contracting, Inc. ("OCI" or "Defendant").  Not. of

16  Rem., Ex. B (Compl.), Dkt. No. 1.  Defendant now moves for an order granting summary judgment

17  in its favor.  Dkt. No. 37.  Plaintiff has filed an Opposition (Dkt. No. 44), to which Defendant has

18  filed a Reply (Dkt. No. 45).  The Court finds this matter suitable for disposition without oral

19  argument and hereby VACATES the October 3, 2013 hearing.  Civ. L.R. 7-1(b).  After carefully

20  considering the parties' briefs and the controlling legal authorities, the Court DENIES Defendant's

21  Motion for the reasons set forth below.

22                          **BACKGROUND**

23       Defendant provides construction management for telecommunications projects.  Dkt. No. 37,

24  Declaration of Charles H. Kline ("Kline Decl.") ¶ 5.  With such construction projects, Defendant

25  uses multiple levels of management.  A regional construction manager ("RCM") has overall

26  responsibility for construction in a given region.  *Id.*  The RCM supervises a number of lead

27  construction managers ("LCM"), who supervise field construction managers ("FCM"), who in turn

28  supervise the subcontractors who do the physical construction. *Id.*  According to the job description,

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

LCMs are responsible for managing the overall project execution performance, including scope,

cost, safety, quality, schedule, implementation, and customer satisfaction.  Kline Decl., Ex. C.

Defendant hired Plaintiff in early February 2011 as an LCM to work on its Sprint Network

Vision Project ("Project).  Joint Statement of Fact ("JSUF") ¶ 1; Kline Decl. ¶ 6.  The Project is a

nationwide upgrade of Sprint's wireless network infrastructure, and Samsung provides the

equipment for this upgrade in the San Francisco Bay Area Region.  Kline Decl. ¶¶ 7, 8.  OCI[1] then

provides construction management for Samsung's upgrade in the Bay Area.  *Id.* ¶ 8.  First, OCI

plans the installation of equipment on Sprint's cell sites, then it hires, coordinates, and supervises the

subcontractors who do the physical installation.  *Id.*  OCI was responsible for 1,200 cell sites in the

San Francisco Bay Area.  JSUF ¶ 3.

When OCI hired Plaintiff, the Project was just getting started in the Bay Area.  Kline Decl. ¶

14.  At the time, the only personnel were Jim Amato, B&V's regional director, and Amato's

assistant.  *Id.*  Plaintiff was the first construction manager OCI hired and was assigned 243 cell sites.

*Id.* ¶¶ 14; 23.  Smith had more than 15 years of experience in the telecommunications construction

industry, including five years of experience as a construction manager.  JSUF ¶ 2.  Defendant states

that it hired Plaintiff "because he had the experience and knowledge necessary to make independent

judgment calls when planning and managing the upgrade of a sophisticated cellular network."  Kline

Decl. ¶ 14.  Defendant paid Smith a salary of $95,000 annually (a monthly salary of $7,307.70), and

his employment was at will.  *Id.*, Exs. D, E; JSUF ¶ 5.  About a month after Smith started working

on the Project, OCI hired another LCM and an RCM, Art Cunningham.  Kline Decl. ¶ 14.  Smith

reported to his RCM, Cunningham.  *Id.*

While working for OCI, Plaintiff only had one of the sites he was assigned built to

completion.  Dkt. No. 44, Declaration of Brad Stuckey ("Stuckey Decl."), Ex. A (Smith Dep.)[2]

---

[1] Samsung chose Black & Veatch Corporation ("B&V") to manage the upgrade, and OCI is a wholly owned subsidiary of B&V.  Kline Decl. ¶ 8.

[2] As Exhibit A, Mr. Stuckey attached two of Plaintiff's depositions taken on different days: February 22, 2013 and May 8, 2013.  To avoid confusion, the Court will refer to both of these

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   119:7-12; JSUF ¶ 1; Kline Decl. ¶ 36.  Smith stated that the whole time he was working at OCI he

2   was doing "up-front work," and only a handful of his sites went into construction.  Dkt. No. 44

3   (Smith Dep.) 119:7-12.  According to Defendant, the first of Smith's cell sites was beginning actual

4   construction at the time of Smith's termination on January 11, 2012.  Kline Decl. ¶ 36.

5   **A.     Microwave Analysis Surveys**

6           One of Smith's first activities on the Project was coordinating surveys by a firm that

7   specialized in site-to-site microwave analysis.  *Id.* ¶ 15.  Plaintiff testified that he did not have the

8   skill to do this analysis, and OCI contracted the surveys to contractors.  Dkt. No. 44 (Smith Dep.)

9   48:4-7.  Defendant states that Plaintiff was OCI's contact with the firm conducting the analysis, and

10  Plaintiff scheduled the surveys and then verified the quality of those surveys.  Kline Decl. ¶ 15.  To

11  make this verification, Defendant states that Smith consulted with the database Siterra,[3] as well as

12  photographs, topographical maps, and antenna height; he had to anticipate obstacles to the signal,

13  such as planned buildings and growing trees.  *Id.*; Dkt. No. 44 (Smith Dep.) 52:12-24.  Defendant

14  states that each evaluation required Plaintiff to exercise independent judgment.  Kline Decl. ¶ 15.

15  Plaintiff describes his activities as verifying that the survey firms "weren't just copying, pasting the

16  information that already exists, but they were actually confirming."  Dkt. No. 44 (Smith Dep.)

17  53:10-17.  He explained that he had to verify that "their information is close to what we already

18  knew was there and not just shooting from the hip and making up bologna surveys."  *Id.*  Smith

19  checked their quality and if the work did not pass, he stated that his RCM, Art Cunningham, would

20  ask the contractors to redo the work via Smith.  Dkt. No. 44 (Smith Dep.) 49:8-16.

21          Plaintiff worked on the microwave phase for six to eight weeks.  *Id.* at 54:5-7.  During that

22  time he spent five or more hours a day reviewing these submissions and resubmissions.  *Id.* at 53:25-

23  54:3; 8:16.  Plaintiff testified that "for the most part" he was the person who would find the errors

24  ─────────────────────

25  depositions as "Dkt. No. 44 (Smith Dep.)."

26          [3] Siterra is a nationwide data base of cell towers that Sprint leases.  Siterra contains the

27  histories of cell sites, including leases, photographs, and construction drawings for previous
    equipment installations.  Kline Decl. ¶ 16.

28

3

1   and request resubmissions. *Id.* at 54:19-21. He agreed that this was a necessary step if the

2   microwave project went forward for the construction to begin. *Id.* at 54:22-25. But the microwave

3   phase of the project did not go forward. *Id.* at 49:19-22. The project changed and Sprint decided to

4   stop the microwave surveys. *Id.*

5   **B.     Research and Information Gathering**

6          While Plaintiff was working on the microwave phase, he was also engaged in research and

7   information gathering. Dkt. No. 44 (Smith Dep.) 55:4-56:4. Plaintiff testified that he received a

8   constant barrage of emails from Cunningham addressing other things they needed to address. *Id.* at

9   55:9-21. He explained that there was a lot of research done in Siterra and information gathering

10  composed and delivered to Cunningham. *Id.* at 55:22-24. Smith stated that Cunningham was also

11  doing this research and information gathering. *Id.* Smith agreed that it would be fair to describe this

12  activity as part of the planning for the upcoming construction. *Id.* at 56:5-8. He describes this

13  activity as "trying to pull as much information that we could out of Siterra that may be helpful in

14  developing a plan." *Id.* at 56:22-24. Smith testified that he was "just gathering the information so

15  that an electrical engineer who is licensed can make these determinations if it will work." *Id.* at

16  58:1-10. They addressed these issues throughout the project. *Id.* at 56:17-23; Dkt. No. 37,

17  Declaration of Julia Azrael ("Azrael Decl."), Ex. A (Smith Dep.)[4] 63:13-15.

18         1.     Scoping

19         Defendant describes scoping as determining what needed to be done to complete the upgrade

20  on a given cell site. Kline Decl. ¶ 17. Plaintiff describes scoping as "more or less taking the

21  information that is existing and seeing if we can implement the Samsung/Sprint concept." Dkt. No.

22  44 (Smith Dep.) 76:10-12. Smith, Cunningham, and another LCM, Mike Foster, scoped the

23  approximately 1,200 cell sites in the Bay Area Region. Kline Decl. ¶ 17. Plaintiff testified that they

24  were "lucky to scope four sites a day, and we had 1200, so, you know, it took months. It took

25

26         [4] Like Mr. Stuckey, Ms. Azrael included Plaintiff's depositions from February 22, 2013 and
   May 8, 2012 in one exhibit, Exhibit A. Although Ms. Azrael separates the depositions into two
27  different volumes, for consistency, the Court will refer to the two depositions transcripts provided by
   Defendant as "Dkt. No. 37 (Smith Dep.)."

28

4

UNITED STATES DISTRICT COURT
For the Northern District of California

1   months." Dkt. No. 37 (Smith Dep.) 77:22-25.  Plaintiff never visited any of the sites during the

2   scoping phase.  Dkt. No. 37 (Smith Dep.) 214:20-22.

3        The scoping phase required Smith to sit in on meetings with a site acquisition ("SA")

4   manager, a radio frequency ("RF") engineer, and a representative from architecture and engineering

5   ("A&E").  Kline Decl. ¶ 18; Dkt. No. 44 (Smith Dep.) 71:5-11.  These meetings were conversations

6   about specific sites, one site at a time.  Dkt. No. 44 (Smith Dep.) 71:16-17.  Plaintiff testified that the

7   idea behind the meetings "was to address all problems to the best of our ability at that time."  *Id.* at

8   71:17-18.  Plaintiff described these meetings as follows: "RF would say this is what we want.  Site

9   acquisition would say then that's what I need to try and get the lease for.  And construction would

10  say that looks doable, or not."  *Id.* at 209:2-6.  Plaintiff's role was to identify things that could be an

11  issue from a construction perspective.  *Id.* at 210:1-2.  He testified that he "just . . . identif[ied] issues

12  that site acq and RF may have to also consider in their design."  *Id.* at 210:5-7.

13       To be able to identify these issues, Plaintiff consulted with Siterra and other resources, at

14  times from home to prepare for the next day's scoping meeting.  Dkt. No. 44 (Smith Dep.) 210:8-

15  211:118.  Plaintiff provided an example of a type of issue he would identify, such as "guarantee[ing]

16  the accuracy of . . . the hybrid cable lengths for the fiber and DC power to the RAUs."  *Id.* at 211:8-

17  14.  At the scoping meetings, Plaintiff would identify the potential problems in the development of

18  the Sprint upgrade, based on his experience and the information they had at the time.  *Id.* at 69:7-11.

19  Defendant states that together, RF, SA, and Smith would create a scoping document, which an

20  architecture and engineering firm would use to create zoning drawings and construction drawings.

21  Kline Decl. ¶ 22.  Plaintiff testified that the scoping document was a document provided by

22  Samsung.  Dkt. No. 44 (Smith Dep.) 81:8-9.  He explained his role was "more to assist the RF and

23  the site acquisition people to determine what they needed to lease for and submit permits and

24  ultimately constructability."  *Id.* at 212:6-9.  When asked whether the information Plaintiff provided

25  to site acquisition was important, Plaintiff responded: "[a] construction manager thinks it's

26  important, but the site acquisition team doesn't necessarily think it's important," explaining "we

27  encounter the problems that they don't care about."  Dkt. No. 37 (Smith Dep.) 69:12-16; 23-24.  In

28

UNITED STATES DISTRICT COURT
For the Northern District of California

5

1    this phase, Plaintiff stated he was "put into scoping for eight hours a day." *Id.* at 79:17-18.

2         2.    Tracker

3         During that same time, Plaintiff stated that he had to continue to update the trackers, a

4    wholly different entity than the scoping document. Dkt. No. 37 (Smith Dep.) 79:17-22. According

5    to Defendant, the tracker was an extremely complex Excel spreadsheet that lists critical information

6    for each of the 1,200 cell sites. Kline Decl. ¶ 30. Defendant describes Plaintiff as using a tracker

7    "to manage everything that happened in the construction process, from planning to execution." *Id.*

8    When Plaintiff was asked how he used the tracker, he stated that he used "a tool that was an

9    extraction of the tracker." Dkt. No. 44 (Smith Dep.) 81:11-22. He testified that Cunningham

10   provided him a list of priorities, and he used a "filtered down tracker showing the priorities, so then

11   it would be easy for me to provide that information that Art [Cunningham] has requested, send it

12   back to him for him to extract it and put it into the tracker." *Id.* at 81:11-82:22. Later he described

13   that he was "given a list of priorities on a tracker that had a bunch of blank spots in it and the black

14   spots need to be filled in with information." *Id.* at 170:9-11. Plaintiff explained that he and the

15   FCMs would then gather information so that Russell Mix, an RCM, could then accurately

16   communicate with the client." *Id.* at 170:11-15.

17        Plaintiff gathered this information by using Siterra. Dkt. No. 37 (Smith Dep.) 82:2-4. He

18   agreed that in using Siterra he brought his experience from his field construction management

19   background. *Id.* at 73:3-9. Then when asked why a person with a construction manager background

20   would be identifying and providing information from Siterra, Plaintiff responded: "Just because

21   there wasn't anyone else hired on. I mean, anybody could have done it. It wasn't rocket science. It

22   didn't take any management skill to go into Siterra." Dkt. No. 44 (Smith Dep.) 82:5:12.

23   Cunningham, Plaintiff's RCM, instructed Smith to confirm all information on Siterra with three

24   separate references. Dkt. No. 37 (Smith Dep.) 211:8-18.

25        When asked how the use of the tracker fit into the construction management of the program,

26   Plaintiff responded: "As I understand it, the information in the tracker was provided to Samsung

27   who then extracted information from the tracker and utilized it in their own separate tool, and I don't

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

know what that tool was." Dkt. No. 37 (Smith Dep.) 82:13-18.  Defendant describes the tracker as very important to OCI because it is the interface through which OCI coordinates the construction process.  Kline Decl. ¶ 34.  OCI made the tracker available to Sprint and Samsung so they could monitor progress, analyze construction issues, and know when the sites were ready for "integration." *Id.* ¶ 35.  The tracker also allowed Samsung to evaluate OCI's performance.  *Id.*  Plaintiff agreed that the tracker was an important tool for reporting to Samsung.  Dkt. No. 37 (Smith Dep.) 88:6-8.

The tracker evolved over time, growing from 65 columns to 203.  Dkt. No. 37 (Smith Dep.) 82:24-83:2.  According to Plaintiff, each column had pertinent information that needed to be provided and a site list of priorities.  *Id.* at 83:2-4.  Plaintiff agreed that the tracker was partly a scheduling and calendar tool.  *Id.* at 83:4-6.  But he testified that he had no accountability for inputting information in the tracker that would be used to schedule the entire construction of any given site, and that he had no responsibility over the accuracy of the dates for a given site as input into the tracker.  Dkt. No. 44 (Smith Dep.) at 85:4-16, 86:7-10.  Plaintiff testified that the site acquisition management team entered the construction start dates, and from those dates Defendant tried to formulate the master tracker with a logical sequence of time frames from construction start to construction finish, and all the milestones in between.  *Id.* at 231:9-18.  According to Smith, it was Russell Mix's responsibility to put in the forecast dates for the various downstream phases.  *Id.* at 86:19-21.  And Mix got the forecast dates from a formula placed in the tracker that would project out from the construction date to the construction complete date.  *Id.* at 87:1-6.

The only dates Smith testified that he was expected to provide before construction began were bid walks and other dates that he said he provided to the project coordinator who put that information into the master tracker.  Dkt. No. 44 (Smith Dep.) 231:19-24.  Smith testified that he did not have a project coordinator or facilitator helping him with his workload.  *Id.* at 156:13-14.  But he explained that the five LCMs funneled information to a project coordinator, who was tasked with taking their updates and status changes.  *Id.* at 87:23-24; Dkt. No. 37 (Smith Dep.) 88:2-5.  Smith testified that he would review material off Siterra, then provide that information to others who would put it into the tracker.  Dkt. No. 44 (Smith Dep.) 180:25-181:8.  According to Plaintiff, he had

1   no control over the timing or phase his sites were in. Dkt. No. 37 (Smith Dep.) 83:19-84:6. When

2   asked, Plaintiff agreed that his information gathering task felt like "just doing clerical work,"

3   although he states that he knew there was actual construction benefit to extracting that clerical

4   information. *Id.* at 63:19-24. Plaintiff also testified that the information he provided was necessary

5   for the construction management to proceed. Dkt. No. 44 (Smith Dep.) 181:9-11. Later, when asked

6   again if he believed he was doing "just clerical work, data entry-type work," Smith responded, "[f]or

7   the most part, yeah." Dkt. No. 37 (Smith Dep.) 161:10-12.

8   **C.      Redlining**

9          According to Defendant, another critical part of Smith's job was redlining. Kline Decl. ¶ 24.

10  Defendant states that the purpose of redlining was quality control. *Id.* A&E created zoning

11  drawings ("ZDs") (for zoning approval by local government) and construction drawings ("CDs")

12  (more detailed drawings also used by subcontractors). *Id.* ¶¶ 22, 25, 26. Then Smith would review

13  the drawings and, if necessary, indicate changes needed to be made and send them back to A&E to

14  be corrected. *Id.* ¶¶ 22, 24. SA then used the completed zoning drawings to obtain zoning permits.

15  *Id.* ¶ 22. And subcontractors used the completed construction drawings as blueprints for the

16  physical construction of the upgrade. *Id.* ¶ 24. According to Defendant, Plaintiff's redlining was the

17  final review of construction drawings for sites under his management. *Id.* ¶ 16.

18         Smith received the drawings when they were called 90% ZDs or CDs. Kline Decl. ¶¶ 22, 24.

19  Later, they would become 100% ZDs or CDs. *Id.* For the 90% ZDs, Smith explained that the site

20  acquisition management team was expected to review the drawing, and the lead CM was also

21  expected to review and sign off before it could go on to a 100% ZD. Dkt. No. 44 (Smith Dep.)

22  92:24-93:3. Plaintiff testified that most of the time he did not review the 90% ZD for accuracy, but

23  instead stated that "We just stamped it. Even though a name may be associated with it, it wasn't

24  reviewed. There wasn't time enough to review every 90 percent ZD." *Id.* at 93:4-12. He testifies

25  that "somebody had to stamp off on them, whether they made any changes or not. In order for them

26  to go into the permitting process somebody had to stamp off on them, whether they were reviewed

27  or not." Dkt. No. 37 (Smith Dep.) 99:7-10.

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

8

But Plaintiff did redline construction drawings, which he said was more pertinent to "us as construction." Dkt. No. 44 (Smith Dep.) 93:13-20; 94:2-4. Plaintiff testified he engaged the FCMs in doing the redlines, but that was "short-lived." Dkt. No. 37 (Smith Dep.) 94:5-10. But he also testified that he had other resources around him so that he "was able to keep up on other tasks by having redlines done by others." *Id.* at 94:11-13. When asked what knowledge he had that enabled him to redline documents, Plaintiff responded, "Just field experience." *Id.* at 96:12-14. The redlining started "maybe in April," and they were doing redlines for "months and months," some days for eight hours a day. *Id.* at 97:1-20. When asked if redlining was a significant part of his day before October when construction began, Plaintiff replied, "Some days, yes." *Id.* at 97:21-24. From October to January, Plaintiff estimated that he spent 35-40% of his time redlining. *Id.* at 135:3-7.

Plaintiff described two schools of thought on redlining: "capture every detail" or "push it through." Dkt. No. 37 (Smith Dep.) 94:17-20; 95:8-10. Plaintiff testified that he had the resources to give him "as much detail as they knew or they had the ability to see, either through a field visit or Siterra." *Id.* at 95:12-14. Smith also explained that some of the redlines were based on hypotheticals, because "nobody, even Samsung didn't know how to put their own equipment together." *Id.* at 98:25-99:3. He stated that his school of thought was "always more is better, the more detail you knew, the better off you would be with your hundred CDs." *Id.* at 95:14-17. He explained that "there were those that wanted us to put that much detail into a redline for the A and E to go back and redraw it so that when the hundred CDs came back there were as accurate as possible." *Id.* at 95:1-5.

**D.    Bid and Site Walks, Purchase Order Requests, and Change Order Requests**

   1.    Bid and Site Walks

Based on the construction drawings, Plaintiff would "call out" a project to a contractor who would then give him a bid. Dkt. No. 44 (Smith Dep.) 118:2-9. Defendant describes this process as Smith presenting the scope of work to a subcontractor, who would in turn submit to Smith a bid for labor and materials. Kline Decl. ¶ 27. Smith explained that the bids were not competitive. Dkt. No. 44 (Smith Dep.) 118:6-7. He did not have a role in selecting the general contractor that came to bid.

9

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Dkt. No. 44 (Smith Dep.) 118:21-23.  He testified that he was "more or less given, Here is who is

2    building this site."  *Id.* at 119:3-4.

3           Plaintiff would prepare the "scope of work" by going out beforehand and putting together

4    "the understanding of what I needed to communicate or what needed to be communicated to the

5    contractor so that he could put a bid together."  Dkt. No. 44 (Smith Dep.) 119:14-21.  He described

6    this preparation as taking photos, looking at the site, and comparing it with construction drawings.

7    *Id.* at 119:23-25.  At the scope of work site visit, Plaintiff explained that "with the understanding I

8    had at any given moment from Samsung and what they wanted to accomplish, I would go out to

9    those priority sites that were going to be a construction start date, the soonest I would go out to those

10   sites, visit them, take photos, see what's existing, and plan for a final configuration and put together

11   a scope of work."  *Id.* at 128:4-15.  This included determining whether the scope of work included a

12   power upgrade, adding additional boom for more antennas, how the fiber would be routed, and

13   more.  *Id.*  At the scope of work walks, Plaintiff testified he was alone with only his drawings,

14   camera, and experience.  *Id.* at 128:18-24.  When asked what percentage of time he spent on these

15   walks, Plaintiff responded, "[n]ot a lot."  Dkt. No. 37 (Smith Dep.) 120:11-14.

16          Plaintiff explained that the purpose of the bid walks was to "identify the scope of work,

17   communicate clearly and accurately to the best of my ability to the contractor what Samsung wanted

18   to do if it didn't change before we actually did it."  Dkt. No. 37 (Smith Dep.) 121:21-24.  When

19   asked it he believed he was successful in being able to present and identify the scope of the work to

20   the general contractors, Plaintiff replied "With the – the knowledge and understanding I had of what

21   Samsung wanted to accomplish, yes; if it changed after a bid walk was completed, no."  *Id.* at

22   122:10-15.  But Plaintiff testified that Samsung "changed its direction" on "a hundred percent" of

23   the jobs.  *Id.* at 123:3-5.  After these changes, Plaintiff testified he would have to get a proposal from

24   a contractor "as to how this would affect the cost of the project."  *Id.* at 124:1-6.  After receiving that

25   information, Plaintiff would "feed it upstream to Art Cunningham at that time."  *Id.* at 124:7-8.

26          Asked whether he would make recommendations as to solutions for these changes, Plaintiff

27   testified that he has "always been the kind of CM that requested solutions provided by my

28

10

contractor." Dkt. No. 37 (Smith Dep.) 124:15-20.  But he also testified that "when it came down to the rubber meeting the road, I tried to reduce my liability by saying, This is how you are going to do it.  I always wanted other opinions and solutions.  I wanted to weigh options and present solutions to those above me and get their feedback and then as a team make a decision." *Id.* at 124:20-125:1. He stated that "as a team, my regional, myself and other lead CMS, we were able to determine what would be best, if it was cost effects, if it maintained our margin." *Id.* at 125:8-11.  When asked if problem-solving was part of his job as an LCM, presenting the best solution, alternative solutions, making recommendations, and weighing them, Plaintiff responded "[y]es, presenting alternative solutions definitely was." *Id.* at 125:12-17.  Smith explained that a "contractor can make suggestions that may eliminate certain scopes of work that I've identified as necessary," and that ultimately, they would come to an agreement that Smith would follow up with an e-mail "that that is the direction we would go." *Id.* at 127:5-12.

> 2.   Purchase Order Requests

Prior to construction, Smith was also involved with purchase order requests ("POR").  Dkt. No. 37 (Smith Dep.) 138:9-11.  When OCI awarded a site to a contractor, a POR needed to be submitted by Plaintiff, which he attached to an email that would be "forwarded upstream." *Id.* at 138:12-20.  The bid originated from the contractor, which was reviewed by Plaintiff, then reformatted onto the POR by OCI. *Id.* at 138:21-139:1.  Smith reviewed the POR to check that it matched the scope of the work that was communicated to the contractor. *Id.* at 139:6-9.  He testified that his review could take minutes, or it could take days if the POR did not include all that was identified as a scope of work. *Id.* at 139:10-14.  In that case, the contractors would have to go back and submit a new proposal, then Plaintiff would review it again. *Id.* at 139:14-16.  Plaintiff testified that there were numerous back-and-forths on PORs because "designs change, constructability changes, what we thought we could do we couldn't do." *Id.* at 120:3-5.  The RCM would develop a POR for processing.  Kline Decl. ¶ 27.

Smith began reviewing PORs in September of 2011.  Dkt. No. 37 (Smith Dep.) 139:21-22. Although reviewing PORs was not a substantial part of his day, he testified that cumulatively it

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

11

1    amounted to a substantial amount of time. *Id.* at 139:23-25; 140:4-6.  He explained that this was due

2    to the "back and forth, the lead time, the delay in getting to POR revised, received back, reviewed

3    again . . . the feedback, you know the other – the regional having his input reminded me of did you

4    get this, did you get this, is this covered, is this covered, you know so it wasn't just me involved in

5    the POR, it was also the regional." *Id.* at 140:5-16.  But Smith also testified that "I look at things

6    now and PORs didn't take up a lot of my time." *Id.* at 143:2-3.  When asked what ultimately

7    happened to a POR, Plaintiff said, "I don't know.  I don't have visibility to those things that are

8    really above me, whatever the regional CM is responsible for, other than him providing me a tracker

9    that shows priorities and what's – what are my next sites to build and bid walk and what not.  I don't

10   have a whole lot of visibility to what they do with the paperwork." *Id.* at 143:12-20.

11                  3.      Change Order Requests

12          If the scope of work for a site changed after the POR had been approved, the subcontractor

13   would submit a change order request ("COR").  Kline Decl. ¶ 28; Dkt. No. 37 (Smith Dep.) 146:2-6.

14   Smith testified that he was involved with CORs.  Dkt. No. 44 (Smith Dep.) 145:13-15.  According to

15   Defendant, Smith was responsible for ensuring that any CORs were appropriate and accurate.  Kline

16   Decl. ¶ 28.  General contractors would sometimes present Smith with CORs, which could have come

17   through field managers as well.  Dkt. No. 44 (Smith Dep.) 147:1-10.  Plaintiff testified that his duty

18   with CORs was "[j]ust feed it up the food chain." *Id.* at 147:11-13.  When asked if he had the ability

19   to approve a COR, Smith stated "I don't think I ever took the authority even if I had it . . . because

20   others wanted visibility beforehand, so I was more or less a conduit for additional information." *Id.*

21   at 147:14-18.  According to Smith, "they wanted control of the finances, so they didn't want lead

22   CMs approving things." *Id.* at 147:21-22.  Smith testified he spent "approximately very little" time

23   reviewing CORs. *Id.* at 147:11-13.

24   **E.      Relationships with Other Employees**

25                  1.      Field Construction Managers (FCMs)

26          OCI began hiring FCMs around October 2011.  Dkt. No. 44 (Smith Dep.) 147:14-16; 166:9-

27   19.  Smith had Jeff Long and Joe Mertz as his FCMs, but he said he played no role in their hiring.

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

12

*Id.* at 147:17-20.  Other lead construction managers also used the FCMs when needed.  Dkt. No. 37 (Smith Dep.) 269:24-270:3.

Smith also explained that he felt he was not managing Mertz and Long because he was only passing along orders from above.  Dkt. No. 37 (Smith Dep.) 173:8-12.  According to Plaintiff, even though Mertz "fell under my wing, I had no authority over him.  He was directed by others from day one."  *Id.* at 167:16-20.  Smith explained that Long and Mertz both reported to him on various projects, but those projects came from RCM Russell Mix or Jim Amoto.  *Id.* at 169:14-25.  According to Plaintiff, those projects were first handed to Plaintiff by Mix via the tracker, the Monday morning meeting, or the conversation of priorities, and then Plaintiff would "hand off [the project] to Joe or Jeff."  *Id.*  These projects would include tasks like measuring a length of a cable or the amperage of the service.  *Id.*  Smith explained that "more so than not I was given a list of priorities on a tracker that had a bunch of blank spots in it and the blank spots needed to be filled in with information.  I could help Joe and Jeff understand what information we needed to gather so that Russell could, then, communicate to the client accurately and they would go out and get that information."  *Id.* at 170:8-15.

Plaintiff agreed that he helped give Mertz and Long assistance, training, and direction.  Dkt. No. 37 (Smith Dep.) 170:19-21.  He explained that he helped them figure out where and how to get the information that he requested from them.  *Id.* at 170:22-171:9.  He would also "assist them in how to come to the conclusions that the client was expecting to see there, and that was based on the training that I received from people educating me on what the client wanted to see."  *Id.* at 171:5-9.  As Smith's sites were prioritized by construction start dates, he split the sites up between Mertz and Long.  *Id.* at 171:24-25.  Jeff Long was the FCM on Smith's cell site that went into construction.  *Id.* at 288:19-21.

### 2.   Upper Management, Samsung, and Sprint

Plaintiff never had any direct interaction with Sprint.  Dkt. No. 44 (Smith Dep.) 158:18-19.  He also testified that his RCMs and Jim Amoto instructed him not to contact or have interactions with OCI's client, Samsung.  *Id.* at 158:20-159:4.  Smith never attended any regular meetings with

1    Samsung. *Id.* at 159:18-20.  Outside of the interaction with his RCMs, Plaintiff testified that he

2    rarely interacted with upper management.  *Id.* at 163:2-13.

3         Plaintiff testified that he had a "good understanding" with his supervisor Russell Mix.  Dkt.

4    No. 37 (Smith Dep.) 110:10-14.  Plaintiff explained that they "didn't always see eye to eye, but

5    [Mix] expressed on numerous occasions that he respected my opinion.  And ultimately he was in

6    charge, and he would take my advice or my suggestions and take it to heart, but the ultimate

7    decision was his." *Id.* at 110:17-23.  Later, Plaintiff testified he felt there was "too much hands-on

8    by [Mix], that he needed to let go of control and let us manage, but he never let go." *Id.* at 173:13-

9    18.

10        Mix ran weekly Monday morning meetings, attended by all the LCMs and FCMs.  Dkt. No.

11   44 (Smith Dep.) 148:23-149:6.  According to Plaintiff, "those Monday morning meetings were

12   Russell Mix's.  He was the keynote speaker." *Id.* at 149:18-19.  At these meetings they would

13   discuss the "importance of the tracker updates, the forecast dates for all the sites that were assigned

14   to a particular lead CM, the training of how we should utilize our field CMs, and meeting -- the

15   deadlines, the milestones." *Id.* at 149:7-16.  Plaintiff explained that Mix was under a lot of pressure

16   and pushed to meet dates, and he in turn pushed the lead and field CMs.  Dkt. No. 37 (Smith Dep.)

17   149:18-24.  According to Smith, "[u]ltimately everything rolled downhill to myself and the field

18   guys, but everything was always initiated from several layers above us." *Id.* at 149:22-24.  Russell

19   Mix was RCM when Plaintiff was terminated in January 2012.  *Id.* at 173:23-25.

20   **F.    Procedural Background**

21        On April 20, 2012, Plaintiff filed a Complaint against Defendant in Contra Costa County

22   Superior Court.  Not. of Rem., Ex. B (Compl.), Dkt. No. 1.  Defendant removed the case to this

23   Court on May 22, 2012.  Dkt. No. 1.  In his Complaint, Plaintiff brings the following causes of

24   action: (1) failure to pay overtime under California Labor Code section 510; (2) failure to pay

25   minimum wage under Labor Code section 1194; (3) failure to pay wages under Labor Code section

26   204; (4) failure to comply with employment wage statement and record provisions under Labor

27   Code section 226(a); (5) statutory waiting time penalties under Labor Code section 202; (6)

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

14

1   unlawful business practices; (7) wrongful discharge in violation of public policy; and (8) retaliation.

2   Compl. at 4-12.  On January 17, 2013, the Court granted the parties' stipulation to dismiss the

3   seventh and eighth causes of action.  Dkt. No. 25.

4        On July 3, 2013, Defendant filed the present Motion for Summary Judgment, arguing that it

5   properly classified Plaintiff as exempt from the overtime provisions of the California Labor Code,

6   and that all of his remaining claims must therefore fail.  Mot. at 1-2.  In response, Plaintiff argues

7   that he was not properly classified as exempt because he had little if any discretion in his job duties,

8   and the bulk of his job performance included research and data gathering.  Opp'n at 2.

9                                        **LEGAL STANDARD**

10       Summary judgment is appropriate only when there is no genuine dispute of material fact and

11  the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v.*

12  *Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears both the initial burden of production as

13  well as the ultimate burden of persuasion to demonstrate that no genuine dispute of material fact

14  remains.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.

15  2000).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for

16  the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

17       Once the moving party meets its initial burden, the nonmoving party is required "to go

18  beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories,

19  and admissions on file, designate specific facts showing that there is a genuine issue for trial."

20  *Celotex*, 477 U.S. at 324 (internal quotations and citations omitted).  The non-moving party may not

21  rely on the pleadings alone, but must present specific facts creating a genuine issue of material fact

22  through affidavits, depositions, or answers to interrogatories.  Fed. R. Civ. P. 56(c); *Celotex*, 477

23  U.S. at 324

24       The Court must view the evidence in the light most favorable to the nonmoving party.

25  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If a reasonable

26  jury could return a verdict in favor of the nonmoving party, summary judgment is inappropriate.

27  *Anderson*, 477 U.S. at 248.  However, unsupported conjecture or conclusory statements are

28

                                              15

UNITED STATES DISTRICT COURT
For the Northern District of California

1   insufficient to defeat summary judgment.  *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th

2   Cir. 2008).  Moreover, the court is not required "to scour the record in search of a genuine issue of

3   triable fact," *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted), but rather

4   "may limit its review to the documents submitted for purposes of summary judgment and those parts

5   of the record specifically referenced therein."  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d

6   1026, 1030 (9th Cir. 2001).

**DISCUSSION**

7

8   **A.    Overtime**

9          In his first cause of action, Plaintiff alleges Defendant failed to compensate him for overtime

10  hours worked, despite working shifts of more than eight hours per day and more than 40 hours per

11  week.  Compl. ¶¶ 19-20.  Plaintiff alleges Defendant followed a policy and practice of classifying

12  and treating him as an exempt employee, despite the fact that it failed to employ him in an

13  administrative, executive, or professional capacity as defined by applicable law.  *Id.* ¶ 18.

14         In its Motion, Defendant argues that Plaintiff was properly classified as an exempt employee

15  because: (1) his duties involved non-manual work directly related to the management or general

16  business operations of Defendant and its client; (2) he regularly exercised discretion and

17  independent judgment with regard to matters of significance; (3) he performed, under general

18  supervision only, specialized or technical work that requires special training, experience, or

19  knowledge; (4) he performed administrative duties more than half of the time; and (5) it paid him a

20  salary well over minimum wage.  Mot. at 13-22.

21         In response, Plaintiff argues that he did not participate in, or even influence policy-making

22  for Defendant, nor did he personally effect its general business operations.  Opp'n at 11.  Instead,

23  Plaintiff argues that he was simply producing a commodity/service for Defendant at a basic level.

24  *Id.*  Plaintiff also contends that he did not have the ability to practice discretion and independent

25  judgment free from immediate supervision and with matters of significance, but instead was

26  controlled by upper management and closely supervised.  *Id.* at 14.

27         Under California Labor Code section 510, employers must generally pay mandatory

28

16

overtime to any employee who works more than eight hours a day or forty hours a week.  Cal. Lab.

Code § 510(a). However, the Industrial Welfare Commission ("IWC"), a California state agency,

may promulgate exemptions from mandatory overtime.  *Id.* § 515(a).  The IWC promulgates these

exemptions in "wage orders," state regulations enforced by the California Division of Labor

Standards and Enforcement ("DLSE").  The current IWC wage order is Wage Order No. 4-2001,

codified at California Code of Regulations title 8, section 11040.  The 2001 Wage Order establishes

three overtime exemptions: the professional exemption, the executive exemption, and the

administrative exemption.  8 Cal. Code Regs. § 11040(1)(A)(1)-(3).

Here, Defendant argues that Plaintiff was exempt under the administrative exception.  Mot.

at 1, 13.  To exempt an employee under the administrative exemption, an employer must establish

five elements:

> 1.  The employee performs work "directly related to management policies or general business operations" of either the employer or the employer's clients;
>
> 2.  The employee "customarily and regularly exercises discretion and independent judgment";
>
> 3.  The employee works "under only general supervision" while either: (1) performing work along specialized or technical lines requiring special training, experience, or knowledge, or (2) executing special assignments and tasks;
>
> 4.  The employee is "primarily engaged" in exempt work meeting the above requirements; and
>
> 5.  The employee meets a minimum salary requirement.

*Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 830-31 (9th Cir. 2011); 8 Cal. Code

Regs. § 11040(1)(A)(2).  Further, the administrative exemption extends to "all work that is directly

and closely related to exempt work and work which is properly viewed as a means for carrying out

exempt functions."  8 Cal. Code Regs. § 11040.1(A)(2)(f).

Wage Order 4-2001 expressly incorporates certain FLSA regulations effective as of the date

that wage order was issued.  "The activities constituting exempt work and non-exempt work shall be

construed in the same manner as such terms are construed in the following regulations under the Fair

Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201-05,

UNITED STATES DISTRICT COURT
For the Northern District of California

17

541.207-08, 541.210, and 541.215." *Campbell*, 642 F.3d at 831.  In other words, in applying Wage

Order 4-2001, "just as the [labor] statute is understood in light of the wage order, the wage order is

construed in light of the incorporated federal regulations." *Harris v. Superior Court*, 53 Cal. 4th

170, 178-79 (2011).  Thus, the question is whether Plaintiff's work as a construction manager is

encompassed by the administrative exemption as construed in accordance with the relevant statute,

wage orders, and federal regulations.  *Id.* at 179.

The question of whether Plaintiff is an administrative employee exempt from overtime

coverage is a mixed question of law and fact.  *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785,

794 (1999).  The issue of what Plaintiff did as an employee for Defendant is a question of fact, while

the precise scope of the exemptions is a question of law.  *Id.*  Exemptions from statutory mandatory

overtime provisions are to be narrowly construed, and Defendant bears the burden of proving the

exemption is proper.  *Id.* at 794-95.  Finally, "in resolving whether work qualifies as administrative,

courts must consider the particular facts before them and apply the language of the statutes and wage

orders at issue."  *Harris*, 53 Cal. 4th at 190.

> 1.   <u>Work Directly Related to Management Policies or General Business Operations</u>

Under the first element of the administrative exemption, Plaintiff's work must "directly

relate[ ] to management policies or general business operations" of either Defendant or Defendant's

clients.  8 Cal. Code Regs. § 11040(1)(A)(2)(a)(I).  In the applicable Federal Regulations, part

541.205(a) defines the "directly related" phrase as "those types of activities relating to the

administrative operations of a business as distinguished from 'production' or, in a retail or service

establishment, 'sales' work."  29 C.F.R. § 541.205(a) (2000).[5]  The phrase also limits the exemption

to persons who perform work of "substantial importance" to the management or operation of the

business of his employer or his employer's customers.  *Id.*

In the past, some courts have limited their inquiry about whether an employee's work is

"directly related" to the administrative operations of a defendant's business by using the

---

[5] All further undesignated section (regulation) references are to title 29 of the Code of
Federal Regulations in effect and as incorporated by Wage Order 4-2001.

18

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   "administrative/production dichotomy" test.  This test was used to "distinguish[] between[]

2   administrative employees who are primarily engaged in 'administering the business affairs of the

3   enterprise' and production-level employees whose 'primary duty is producing the commodity or

4   commodities, whether goods or services, that the enterprise exists to produce and market.'" *Harris*,

5   53 Cal. 4th at 183 (discussing how the court below had only focused its inquiry on Federal

6   Regulations former part 541.205(a), which differentiates between administrative and production

7   duties).  However, in *Harris*, the California Supreme Court held that in determining whether an

8   employee does work "directly related" to the defendant's administrative operations, courts must do

9   more than simply consider this administrative/production dichotomy.  *Id.* at 188.  Harris held that

10  under Wage Order 4-2001, the incorporated Federal Regulations former part 541.205(a), (b), and (c)

11  must all be read together in order to apply the "directly related" test and properly determine whether

12  the work at issue satisfies the administrative exemption.  *Id.* at 188.

13       Under these incorporated Federal Regulations, "work qualifies as 'directly related' if it

14  satisfies two components.  First, it must be qualitatively administrative."  *Id.* at 181.  Second,

15  quantitatively, it must be of substantial importance to the management or operations of the business.

16  *Id.*  Both components must be satisfied before work can be considered 'directly related' to

17  management policies or general business operations in order to meet the test of the exemption."  *Id.*

18       Federal Regulations former part 541.205(b) discusses the qualitative requirement that the

19  work must be administrative in nature.  *Id.* at 182.  It explains that administrative operations includes

20  work done by "white collar" employees engaged in "servicing" a business, including advising

21  management, planning, negotiating, and representing the company.  29 C.F.R. § 541.205(b).

22  Administrative work may also include "purchasing, promoting sales, and business research and

23  control."  *Id.*

24       The quantitative prong then explains that an administrative employee's duties are "directly

25  related" to management policies or general business operations only if they are of "substantial

26  importance to the management or operation of the business of his employer or his employer's

27  customers."  29 C.F.R. § 541.205(a); *Harris*, 53 Cal. 4th at 182.  Federal Regulations former part

28

19

UNITED STATES DISTRICT COURT
For the Northern District of California

541.205(c) relates to the quantitative component that tests whether work is of "substantial importance." *Harris*, 53 Cal. 4th at 182.  To satisfy the "substantial importance" test, an employee need not "participate in the formulation of management policies or in the operation of the business as a whole."  29 C.F.R. § 541.205(c).  Rather, employees whose work is "of substantial importance" to the management or operations of a business includes those whose "work affects policy or whose responsibility it is to execute or carry it out.  The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business."  *Id.*

Plaintiff's job title as LCM is not determinative; rather, the Court must look to the nature of his day-to-day activities. *Miller v. Farmers' Ins. Exch.*, 481 F.3d 1119, 1125 (9th Cir. 2007) (holding that insurance adjusters were exempt administrative employees, despite the fact that they comprised approximately fifty percent of their employer's workforce and did not supervise other employees); *see also* 29 C.F.R. § 541.201 ("A [job] title alone is of little or no assistance in determining . . . [an employee's status] as exempt or non exempt . . . .  Titles can be had cheaply and are of no determinative value.").

Neither party cites any case law on the direct-relationship test, and the record contains evidence that could support contrary findings regarding the nature of Smith's work.  On one hand, Defendant presents evidence that (1) Plaintiff performed white collar, non-manual work managing the construction of a significant number of OCI's cell sites; (2) Plaintiff helped plan and advise management on important aspects of preparing cell sites for construction; and (3) his various tasks of researching on Siterra, providing information for the tracker, redlining, bid-walks, and purchase order and change order requests all related to business research, control, and representing OCI and their client.  *See* 29 C.F.R. §§ 541.205(a-c).  Such findings could support the conclusion that Smith's work directly related to management policies and general business operations.

There is no question that Smith spent the majority of his time performing non-manual, white collar work, and Smith agrees that he engaged in "research and data gathering."  Compl. ¶ 8.  But he

20

also presents evidence that could support a finding that he performed primarily clerical duties, with only limited opportunities to plan, advise management, negotiate, or represent OCI or Samsung. Plaintiff testified that "[f]or the most part" he was doing "just clerical work, data entry-type work." Dkt. No. 37 (Smith Dep.) 63:19-24; 161:10-12.  Although Plaintiff stated that he knew there was actual construction benefit to extracting that clerical information (*id.* at 63:19-24), Federal Regulations former part 541.205(c)(2) states "[a]n employee performing routine clerical duties obviously is not performing work of substantial importance to the management or operation of the business even though he may exercise some measure of discretion and judgment as to the manner in which he performs his clerical tasks."  29 C.F.R. § 541.205(c)(2).  Smith testified that he was "given a list of priorities on a tracker that had a bunch of blank spots in it and the blank spots need to be filled in with information."  Dkt. No. 44 (Smith Dep.) 170:9-11.  Plaintiff explained that he and the FCMs would then gather information so that RCM Russell Mix could then accurately communicate with the client.  *Id.* at 170:11-15.  This testimony indicates that Plaintiff performed primarily clerical work, while others performed work more related to servicing OCI and its client.

Defendant argues that "[a]ll of Smith's 'research and data gathering' was business research" within the meaning of the Federal Regulations former part 541.205(b), "because it was integral to every state of planning and executing the upgrade."  Mot. at 15.  But Federal Regulations former part 541.205(c)(3) explains that "[i]f all such a person does, in effect, is to tabulate data, he is clearly not exempt."  29 C.F.R. § 541.205(c)(3).  But "if such an employee makes analyses of data and draws conclusions which are important to the determination of, or which, in fact, determine financial, merchandising, or other policy, clearly he is doing work directly related to management policies or general business operations."  *Id.*  It is not clear which of these categories Smith's duties fell under.

Plaintiff describes some of his activities as relating to planning.  For instance, he describes his research and data gathering activities as "trying to pull as much information that we could out of Siterra that may be helpful in developing a plan."  Dkt. No. 44 (Smith Dep.) 56:22-24.  During the scoping phase, Plaintiff used the information he had gathered to identify construction problems at

21

1   the scoping meeting, where together with site acquisition and a radio frequency engineer, he would

2   help create a scoping document, which an architecture and engineering firm would use to create the

3   drawings for construction and zoning for the actual site.  Kline Decl. ¶ 22.  Then, at the scope-of-

4   work type of site visits, Plaintiff explained he "would go out to those [priority] sites, visit them, take

5   photos, see what's existing, and plan for a final configuration and put together a scope of work."

6   Dkt. No. 44 (Smith Dep.) 128:4-15.  These are planning activities involving business research and,

7   to some degree, representation of OCI and its client.

8        Although Defendant has presented persuasive evidence that Smith was at times involved in

9   qualitatively administrative work, Plaintiff's description of his duties provides enough evidence to

10  create a genuine issue of a material fact as to the degree he engaged in servicing Defendant's

11  business and whether his activities were of substantial importance to management policies.  In

12  addition to the duties Plaintiff portrays as clerical, he also presented evidence that even the work he

13  did in identifying construction issues during the scoping phase may not have been particularly

14  important, let alone of "substantial importance," in the design implemented by the site acquisition

15  team and radio frequency engineer.  When asked whether the information Plaintiff provided to site

16  acquisition was important, Plaintiff responded: "[a] construction manager thinks it's important, but

17  the site acquisition team doesn't necessarily think it's important," explaining "we encounter the

18  problems that they don't care about."  Dkt. No. 37 (Smith Dep.) 69:12-16; 23-24.  It is not enough

19  that an employee attempts to make "analyses of data and draw[] conclusions," but that those

20  analyses and conclusions must also be "important to the determination of, or which, in fact,

21  determine financial, merchandising, or other policy."  29 C.F.R. § 521.205(c)(3).  There remains a

22  dispute of material fact as to whether Plaintiff's work was important to the determination of OCI's

23  policy.

24       There is also a genuine dispute remaining as to Plaintiff's duties involving the tracker and

25  forecast dates.  Defendant contends that Plaintiff engaged in business control every time he updated

26  the tracker or forecasted a completion date.  Mot. at 14.  But Plaintiff's testimony disputes both of

27  these contentions.  Smith testified that he had no control or input into the scheduling of

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   construction-related activities on the tracker, nor was he responsible for the accuracy of the

2   scheduling dates in the tracker.  Dkt. No. 37 (Smith Dep.) 85:4-16, 86:7-10.  He testified that others

3   were responsible for forecasting and scheduling.  Dkt. No. 44 (Smith Dep.) 86:19-21; 231:9-18.

4   When it came to the tracker, Plaintiff testified that he used "a tool that was an extraction of the

5   tracker."  *Id.* at 81:11-22.  He testified that his RCM had a list of priorities, and he used a "filtered

6   down tracker showing the priorities, so then it would be easy for me to provide that information that

7   Art [Cunningham] has requested, send it back to him for him to extract it and put it into the tracker."

8   *Id.* at 81:11-82:22.  It is not clear how Plaintiff used the tracker, or a filtered down tracker, or an

9   extraction of the tracker–or whatever it was–actually help him "manage everything in the

10  construction process" as Defendant claims.  Mot. at 11.  Instead, when it came to control over his

11  sites, Plaintiff testified that he had no control over which contractors built his sites or the timing or

12  phase his sites were in.  Dkt. No. 44 (Smith Dep.) 119:3-4; Dkt. No. 37 (Smith Dep.) 83:19-84:6.

13  All of this evidence undermines Defendant's argument that Smith was involved in planning,

14  business control, and business research that was important to the determination of business policy.

15  It is a close issue, but Plaintiff has ultimately produced enough evidence to show that there remains

16  a genuine issue of material fact under this first prong of the analysis.

17          Although not binding, the Court finds the comparisons to the following cases helpful.  In

18  *Combs v. Skyriver Commc'ns, Inc.*, 159 Cal. App. 4th 1242 (2008), the plaintiff sought unpaid

19  overtime compensation from Skyriver, a broadband internet service provider, alleging that he was

20  misclassified as an exempt employee.  *Id.* at 1247.  Combs was the "director of network operations"

21  responsible for project management, budgeting, vendor management, purchasing, forecasting,

22  employee management, management of "overseas deployment of wireless data network,"

23  management of "the integration and standardization of three networks into the Skyriver

24  architecture," and the overseeing of "day to day Network Operations."  *Id.*  The court held that

25  Combs was properly classified as exempt because his duties were directly related to the management

26  or general business operations as "'they directly related to assisting with the running or servicing of

27  the business' . . . and his work included 'budgeting,' 'purchasing,' 'procurement,' and 'computer

28

23

UNITED STATES DISTRICT COURT
For the Northern District of California

network, internet and database administration.'" *Id.* at 1264-65 (citation omitted).  The court noted that Combs was responsible for maintaining, developing and improving Skyriver's network, and his duties involved high-level problem solving, preparing reports for Skyriver's board of directors, capacity and expansion planning, planning for the integration of acquired networks into Skyriver's network, lease negotiations, and equipment sourcing and purchasing. *Id.* at 1264.  In contrast, the evidence here is questionable as to whether Plaintiff had anywhere near the same sort of responsibility relating to servicing the company or performing work of such substantial importance.

In *McCullough v. Lennar Corp.*, 2011 WL 1585017, at *17 (S.D. Cal. Apr. 26, 2011), the court found that summary judgment on the issue of exemption was inappropriate where the plaintiff, an area manager for a company in the business of residential new home construction, presented evidence that his "primary duties involved tasks as a production employee out in the field implementing the schedule or duties that were given to him by the corporate office."  The defendant presented evidence that the plaintiff managed all the subcontractors who were building a reservoir, coordinated with outside teams (including archaeologists, biologists, and city officials), worked with project management, and saved the defendant $5 million by coming up with a design that the defendant used as part of the construction. *Id.* at 16.  Part of the plaintiff's job as area manager was determining the order and priority of the horizontal construction activities, leading weekly meetings with subcontractors and project managers, reviewing the budget, interacting and meeting with city officials related to obtaining necessary inspection approvals, approving subcontractors invoices for payment, and reviewing change orders. *Id.*  In opposition, the plaintiff argued that he was a production employee and that every week he would attend a meeting where the schedule was readjusted, and the following week he would implement the new schedule. *Id.* at 17.

The *McCullough* court found that, based on the defendant's version of the facts, it could be said that the plaintiff's primary duty was the performance of work directly related to the management or general business operations; however, the court ultimately found that because plaintiff presented evidence that his primary tasks were simply implementing the schedule or duties that were given to him by the corporate office, there remained a genuine issue of material fact

24

precluding summary judgment. *McCullough v. Lennar Corp.*, 2011 WL 1585017, at *17. The court found that even if the plaintiff was well qualified as an area manager and the defendant appeared to utilize and follow his recommendations on key business operations, it was not clear whether plaintiff's primary work duties involved work directly related to the management or general business operations of the defendant. *Id.* The same is true here, where it is not clear that Plaintiff's primary work consisted of the types of activities relating to the administrative operations of Defendant's business.

Likewise, in *Gottlieb v. Const. Srvs. & Consultants, Inc.*, 2006 WL 5503644, at *6 (S.D. Fla. July 24, 2006), the court held that the plaintiff, as project supervisor for a company in the business of constructing shells for houses, was not an exempt employee. The business used subcontractors for every phase, and the project supervisors' job was to schedule the subcontractors, order supplies, bill on his construction site, be the company's representative on the construction site, and inspect the work of the subcontractors. *Id.* at 1-2. However, the plaintiff was not responsible for hiring or interviewing subcontractors, and the area manager was generally present on the construction site each a time a new model was built and made any changes to the quantity of supplies needed. *Id.* at 2. If the area manager was not present, the plaintiff was expected to make these changes. *Id.* The plaintiff was also responsible for safety on the construction site. *Id.* at 3. The court explained that the "[p]laintiff's work involved producing the product CSCI existed to market rather than servicing CSCI itself." *Id.* at 6. As such, the court found that plaintiff's primary work was not directly related to the management or general business operations of the employer or the employer's customers. *Id.*

Similarly, in *Cotten v. HFS–USA, Inc.*, 620 F. Supp. 2d 1342, 1353 (M.D. Fla. 2009), the court found that the defendant had not met its burden of establishing that the plaintiff was an administrative employee. The plaintiff was a field supervisor for the defendant, a provider of home finishing services such as installation of tile and hardwood flooring, carpet, decorative trim and molding, and exterior stone and pavers to residential builders. *Id.* at 1344. Although the plaintiff managed certain assigned installation sites, his duties were to ensure "the installers received their work orders, retrieved the correct materials from the warehouse, and completed the installation job

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

as specified in the contract and the work order and in compliance with specified standards." *Id.* at 1348. The plaintiff was not responsible for negotiating or executing contracts, creating work orders or developing the applicable standards; did not perform duties related to financing, budgeting, accounting, auditing, research, employee benefits, taxes, insurance, advertising or computer technology; and was not involved in formulating business policies or procedure. *Id.* Thus, the court concluded that the plaintiff's primary duties were not directly related to the management or general business operations of the defendant. *Id.* at 1350.

Given the similar facts present in this case, the Court finds that a genuine dispute remains as to whether the work Plaintiff performed qualified as administrative duties directly related to Defendant's management policies or general business operations. *See* 8 Cal. Code Regs § 11040(1)(A)(2)(a)(1). Likewise, it is not clear whether Plaintiff's work was of substantial importance to Defendant's business operations. Accordingly, the Court cannot find as a matter of law that Plaintiff's duties qualify as qualitatively and quantitatively administrative, and summary judgment is therefore inappropriate.

## 2.    Discretion and Independent Judgment

Even if the Court found that Defendant met its burden as to the first prong of the analysis, the Court finds that a genuine issue of material fact remains as to whether Plaintiff customarily and regularly exercised discretion and independent judgment. As part of a smaller crew of people identifying construction issues during the scoping phase of the 1,200 sites, and later as a LCM with responsibility for 243 sites, Defendant argues that Plaintiff "made thousands of discretionary decisions and judgment calls, all of which affected the cost, quality, and schedule of the Project." Mot. at 16. Defendant argues that because the Samsung equipment was entirely new, Smith had to solve problems with no ready-made solutions. *Id.* In response, Plaintiff argues that Defendant's upper management kept him on a "short leash," with no ability to practice discretion and independent judgement free from immediate supervision. Opp'n at 13-14.

The "exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various

UNITED STATES DISTRICT COURT
For the Northern District of California

possibilities have been considered." 29 C.F.R. § 541.207(a). The phrase "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." *Id.* Subpart (b) explains that the "phrase must be applied in the light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.207(b). The Regulations warn that the phrase is "most frequently misunderstood and misapplied by employers and employees in cases involving the following: (1) Confusion between the exercise of discretion and independent judgment, and the use of skill in applying techniques, procedures, or specific standards; and (2) misapplication of the term to employees making decisions relating to matters of little consequence." *Id.*

Subpart (d) of the same regulation further explains that "the discretion and independent judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence." 29 C.F.R. § 541.207(a). But this requirement does not necessarily imply that the employee's decisions must have a finality that goes with unlimited authority and a complete absence of review. 29 C.F.R. § 541.207(e). Instead, the employee's exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. *Id.* Finally, an exempt administrative employee must exercise discretion and independent judgment "customarily and regularly," a requirement that is met by the employee who "normally and recurrently" is called upon to exercise discretion and independent judgment in the day-to-day performance of his duties. 29 C.F.R. § 541.207(g).

In support of its argument that Plaintiff regularly exercised discretion and independent judgment, Defendant cites to *Kennedy v. Commonwealth Edison*, 410 F.3d 365 (7th Cir. 2005). In *Kennedy*, the Seventh Circuit upheld summary judgment in favor of the employer, a nuclear power plant. The plaintiffs were "work planners" who were "problem solvers" that devised solutions for electrical, mechanical, and instrumentation problems at the plant. *Id.* at 368. The work planner would study a given problem and then decide what kind of labor, materials, and equipment would be needed for the project. *Id.* The work planners claimed that they did not exercise discretion and independent judgment, because their work place was procedure driven and strictly controlled. *Id.* at

27

1    374. The Court of Appeal disagreed, stating, "Certainly no one would contend that a tax lawyer

2    does not exercise discretion or independent judgment just because the Internal Revenue Code

3    contains a highly regimented set of rules." *Id.* at 374-75. The Court found that all the Plaintiffs had

4    exercised independent judgment and discretion within the meaning of 29 C.F.R. § 541.207 by

5    comparing and evaluating several possible courses of action. *Id.* at 375.

6         Here Defendant argues that "Smith solved complex problems regularly." Mot. at 16.

7    Smith's testimony indicates that at least when it came to his scope-of-work activities, he "wanted to

8    weigh options and present solutions to those above me and get their feedback and then as a team

9    make a decision." Dkt. No. 37 (Smith Dep.) 124:20-125:1. He testified that "as a team, my

10   regional, myself and other lead CMS, we were able to determine what would be best, if it was cost

11   effective, if it maintained our margin." Dkt. No. 37 (Smith Dep.) 125:8-11. When asked if problem-

12   solving, presenting the best solution, alternative solutions, making recommendations, and weighing

13   them was part of his job as an LCM, Plaintiff responded "[y]es, presenting alternative solutions

14   definitely was." Dkt. No. 37 (Smith Dep.) 125:12-17.

15        While this evidence supports a conclusion that Smith exercised discretion and independent

16   judgment, Defendant has not met its burden to show that Plaintiff "customarily" and "regularly"

17   exercised discretion and independent judgment. *See* 29 C.F.R. § 541.207(g). Although Plaintiff

18   testified that he "wanted" to weigh options and present solutions, and that he was part of a "team"

19   that was able to determine what was best for his sites, it is not clear from the evidence how often or

20   how much Plaintiff was really engaged in exercising discretion and independent judgement. And in

21   any case, this requirement is met not when the employee occasionally exercises discretion and

22   independent judge, but only where the employee is "normally and recurrently" called upon to

23   exercise discretion and independent judgment in the day-to-day performance of his duties. *Id*.

24   While Smith arguably admits that he exercised some discretion and independent judgment, it is not

25   clear that this exercise was normal and recurrent.

26        Defendant essentially argues that Plaintiff exercised discretion and independent judgement in

27   all of his activities, including researching site histories on Siterra, identifying construction issues

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    during the scoping phase, reviewing and redlining the zoning and construction drawings,

2    communicating with subcontractors, deciding what information to enter into the tracker, and

3    supervising the FCMs.  Mot. at 17-20.  With Smith's research on Siterra, Defendant argues that "he

4    used his experience to make choices in what to research, how to interpret that research, and how to

5    use the research he found to implement and oversee a complex construction plan."  Mot. at 17

6    (citing Dkt. No. 37 (Smith Dep.) 161:13-24).  In that portion of his deposition, Smith admits that he

7    utilized his construction experience in extracting information from Siterra, but he does not say that

8    he personally used the information to implement and oversee a complex construction plan.  Instead,

9    Plaintiff's testimony consistently indicates that he thought he was providing information to upper

10   management that would be helpful in developing a plan, but not that he had authority or power to

11   make an independent choice, free from immediate direction or supervision and with respect to

12   matters of significance.  *See* Dkt. No. 44 (Smith Dep.) 56:22-24; 58:1-10 (describing that he was

13   "trying to pull as much information that we could out of Siterra that may be helpful in developing a

14   plan," but that he was "just gathering the information so that an electrical engineer who is licensed

15   can make these determinations if it will work"); 170:9-15 (explaining that he used the tracker to fill

16   in the blank spots showing the priorities for his sites so that an RCM could then communicate with

17   the client); 210:1-7; Dkt. No. 37 (Smith Dep.) 69:12-16; 23-24 (describing his role in the scoping

18   phase as identifying things that could be an issue from a construction perspective, but explaining

19   that he "just . . . identif[ied] issues that site acq and RF may have to also consider in their design,"

20   and that the site acquisition team did not "care about" the problems he encountered or find the

21   information he provided important).  Defendant also argues that Plaintiff's experience "allowed him

22   to redline," to provide directions to subcontractors, and identify construction issues in the scoping

23   phase.  Mot. at 17-19.  Plaintiff does not deny that his experience played a role in these duties.

24       "Perhaps the most frequent cause of misapplication of the term 'discretion and independent

25   judgment' is the failure to distinguish it from the use of skill in various respects."  29 C.F.R. §

26   541.207(c)(1); *see also Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1129 (9th Cir. 2002) (warning

27   against "ignor[ing] the regulations' distinction between the use of discretion and the application of

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   skill.").  In *Phase Metrics*, Bothell worked as a field service engineer, installing, troubleshooting,

2   and maintaining Phase Metrics' products.  *Id.* at 1122-23.  Phase Metrics argued that, as a field

3   inspector operating away from his supervisor in a remote location, Bothell necessarily exercised

4   discretion and independent judgment.  *Id.* at 1129.  The Court, however, found that there were

5   genuine issues of fact regarding the extent to which the plaintiff was permitted to make decisions

6   and the importance of the decisions over which he had control.  *Id.*  Even though Bothell's work

7   required specialized knowledge, the Court held that skill is not determinative, and noted that all but

8   the smallest decisions were made by the plaintiff's supervisor.  *Id.*

9        Both the *Phase Metrics* holding and the related regulations caution against confusing

10   application of skill with discretion and independent judgment: "A typical example of the application

11   of skills and procedures is ordinary inspection work . . . .  [I]nspectors rely on techniques and skills

12   acquired by special training or experience.  They may have some leeway in the performance of their

13   work but only within closely prescribed limits."  29 C.F.R. § 541.207(c)(2).  The regulations

14   acknowledge that "[e]mployees of this type may make recommendations on the basis of the

15   information they develop in the course of their inspections (as for example, to accept or reject an

16   insurance risk or a product manufactured to specifications), but these recommendations are based on

17   the development of the facts as to whether there is conformity with the prescribed standards."  *Id.*

18   As a result, "a decision to depart from the prescribed standards or the permitted tolerance is typically

19   made by the inspector's superior."  *Id.*  In such cases, the inspector is engaged in exercising skill

20   rather than discretion and independent judgment.  *Id.*

21        As in *Phase Metrics*, genuine issues of material fact remain here concerning the significance,

22   discretion, and independence of the decisions Plaintiff used in his various tasks, as opposed to

23   merely applying his skill or experience.  Like the inspector in the Federal Regulations, Defendant

24   describes the confines under which Smith and his FCMs had to work, explaining that "[t]he cell site

25   had to work, according to the standards set by the engineers.  It also had to be built within a budget,

26   according to the requirements of the lease, landlord, and jurisdiction."  Mot. at 20; *see also* Dkt. No.

27   37 (Smith Dep.) 288:6-16 (explaining that construction management had to "play within the

28

30

UNITED STATES DISTRICT COURT
For the Northern District of California

1   perimeters of the jurisdiction, the landlord, the lease agreement, and all these other things.").  While

2   the evidence suggests that this Project was novel at least in some respects, it is not clear that Plaintiff

3   was normally and recurrently involved in the high level problem solving.  Although it is a close

4   issue, the Court finds that whether Plaintiff "customarily and regularly exercised discretion and

5   independent judgment cannot be ascertained from the existing record" at this phase in the

6   proceedings.  *Phase Metrics*, 299 F.3d at 1129; *see also* 29 C.F.R. § 541.207(g).  Accordingly, the

7   Court cannot find as a matter of law that Defendant has satisfied its burden as to this prong of the

8   analysis.

9           3.      General Supervision

10          As to the third element, Defendant must establish that Plaintiff worked "under only general

11  supervision" while either: (1) performing work along specialized or technical lines requiring special

12  training, experience, or knowledge, or (2) executing special assignments and tasks.  8 Cal. Code

13  Regs. § 11040(1)(A)(2).  Defendant maintains its argument that Smith performed work requiring

14  and utilizing his experience.  Mot. at 20-21.  It also contends that during the scoping phase, Smith

15  had only minimal supervision, during the redlining phase he "made his own decisions," during his

16  interactions with subcontractors he had "no supervision," and likewise, "[n]o one supervised him

17  when he updated the tracker."  Mot. at 21.  Plaintiff responds that he was "controlled by upper

18  management and closely supervised."  Opp'n at 14.  He argues that all his research assignments

19  originated from upper management, who were also responsible for determining the scope of the

20  tracker, the scheduling of the Project, and even the specific cell sites assigned to Smith.  Opp'n at

21  14.

22          Where there are numerous factual disputes in the record, courts should be cautious in

23  disposing of the general supervision issue at summary judgment.  *See, e.g.*, *Campbell*, 642 F.3d at

24  831-32.  In *Campbell*, the Ninth Circuit held that it could not "conclude as a matter of law that all

25  unlicensed accountants are necessarily subject to more than general supervision."  *Id.* at 832.  The

26  Court noted that both parties had introduced substantial evidence about the nature and scope of the

27  defendant's supervision over plaintiffs, and given the "highly contested" issues of fact, the court

28

31

1   ultimately determined that "a jury should evaluate credibility and weigh this extensive conflicting

2   evidence." *Id.*; *see also Ho v. Ernst & Young LLP*, 2009 WL 111729, at *5 (N.D. Cal. Jan. 15,

3   2009) (finding that the conflicting evidence in plaintiff's deposition testimony and declarations

4   created a triable issue of material fact as to the amount of supervision given her and the degree of

5   independent judgment plaintiff exercised).

6          Here, too, as discussed above, the Court finds that material factual disputes exist in the

7   record.  Plaintiff testimony depicts a situation in which he was closely supervised, explaining that he

8   felt there was "too much hands-on by [RCM Russell Mix], that he needed to let go of control and let

9   us manage, but he never let go."  Dkt. No. 37 (Smith Dep.) 173:13-18.  And although Defendant

10  claims that Plaintiff had no supervision while communicating with subcontractors, Plaintiff's

11  testimony indicates otherwise.  With the PORs, Plaintiff describes receiving "feedback, you know

12  the other – the regional having his input reminded me of did you get this, did you get this, is this

13  covered, is this covered, you know so it wasn't just me involved in the POR, it was also the

14  regional."  Dkt. No. 37 (Smith Dep.) 140:5-16.  Similarly, with the research done in Siterra and

15  other data-gathering, Smith testified that it was his RCMs who determined what they needed to

16  address and what information Smith would have to gather.  Dkt. No. 44 (Smith Dep.) 55:9-21;

17  81:11-82:22; 170:9-11.   Given the numerous factual disputes in the existing record, the Court finds

18  that the determination of whether Plaintiff worked under only general supervision is premature.

19          4.   <u>Primarily Engaged in Exempt Work</u>

20          Under the fourth element, Plaintiff must be "primarily" engaged in duties that qualify under

21  the regulations.  8 Cal. Code Regs. § 11040(1)(A)(2).  The term "'primarily' means more than

22  one-half of the employee's worktime."  Cal. Lab. Code § 515(e).  Thus, "state regulation takes a

23  purely quantitative approach" as to whether an employee is exempt or non-exempt.  *Ramirez*, 20

24  Cal. 4th at 797 (1999).  Pursuant to 8 Cal. Code. Regs. § 11040(1)(A)(2)(f), exempt work includes

25  "all work that is directly and closely related to exempt work and work which is properly viewed as a

26  means for carrying out exempt functions."  *Id.*  "The work actually performed by the employee

27  during the course of the workweek must, first and foremost, be examined and the amount of time the

28

UNITED STATES DISTRICT COURT
For the Northern District of California

32

UNITED STATES DISTRICT COURT
For the Northern District of California

1    employee spends on such work, together with the employer's realistic expectations and the realistic

2    requirements of the job, shall be considered in determining whether the employee satisfies this

3    requirement." *Id.*

4         Despite Defendant's contention that 100% of Plaintiff's activities were administrative (Mot.

5    at 22, 24), as discussed above, the Court finds that genuine issues of material fact exist as to whether

6    Plaintiff's activities are all properly classified as administrative.  Even if the Court had found that

7    some of Plaintiff's activities were administrative in nature, Defendant has not met its burden to show

8    that these activities amounted to more than 50% of Plaintiff's workweek.  *See Marlo v. United*

9    *Parcel Serv., Inc.*, 639 F.3d 942, 948 (9th Cir. 2011) (finding that the district court did not err in

10   requiring a week-by-week determination of exempt status).  Defendant's statements about the

11   numbers of hours Smith worked on a particular project without context related to the total number of

12   hours worked is not evidence that can be used towards meeting its burden.  Likewise, its

13   descriptions of percentage of time worked without providing the number of days, weeks or months

14   on a particular project cannot be used to meet its burden.  The only statement made by Defendant

15   that goes towards this prong of the analysis is that from October 2011 until January 2012, Smith

16   spent 35-40% of his time redlining.  This does not establish that more than 50% of Plaintiff's

17   workweek consisted of work that qualifies under the administrative exception.  Accordingly, the

18   Court finds that triable issues exist as to this prong that preclude the entry of summary judgment.

19        5.    Salary Requirement

20        Finally, an administrative employee must "earn a monthly salary equivalent to no less than

21   two (2) times the state minimum wage for full-time employment.  8 Cal. Code Regs. §

22   11040(1)(A)(2)(g).  Full-time employment is defined in Labor Code section 515(c) as 40 hours per

23   week.  *Id.*  The parties agree in their Joint Statement of Undisputed Facts that Plaintiff's monthly

24   salary was $7,307.07.  JSUF ¶ 4.  This total, according to the Court's informal calculations, is more

25   than five times the monthly salary of an individual earning California's applicable minimum wage

26

27

28

33

UNITED STATES DISTRICT COURT
For the Northern District of California

rate of $8.00 per hour.[6]  While the Court agrees that Plaintiff was paid a salary commensurate with that of an administrative employee, it also notes that Plaintiff's wage statements and offer letter reflect a higher monthly salary of $7,916.67, and an annual salary of $95,000 per year.  *See* Dkt. No. 37, Exs. D, E.

>        6.        Summary

Based on the analysis above, the Court finds that Defendant has failed to meet its burden to establish as a matter of law that Plaintiff was properly classified as an exempt employee, and that issues of material fact exist on this issue.  Accordingly, the Court DENIES Defendant's Motion as to Plaintiff's first cause of action for overtime under California Labor Code section 510(a).

**B.      Failure to Pay Minimum Wage**

In his second cause of action, Plaintiff alleges that Defendant failed to pay him the legal minimum wage for all hours he worked in violation of Labor Code section 1194.  Compl. ¶¶ 22-27. Plaintiff also seeks liquidated damages pursuant to section 1194.2.  Compl. ¶ 23.  Defendant argues that this claim must fail because Plaintiff was not entitled to overtime compensation.  Mot. at 22. However, as discussed above, the Court is unable to determine at this stage in the proceedings whether Plaintiff was properly classified as an exempt employee.  Accordingly, the Court DENIES Defendant's Motion as to this cause of action.

**C.      Failure to Pay Wages**

In his third cause of action, Plaintiff alleges that Defendant failed to pay him for all hours worked in violation of Labor Code section 204.  Compl. ¶¶ 29-33.  Section 204 governs when employees are to be paid their wages and requires that all wages "earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays."  Cal. Lab. Code § 204(a).  Here, Plaintiff's pay statements show Defendant consistently paid his salary according to the statutory timetable.  Azrael Decl., Ex. E.  However, they do not show that Defendant paid Plaintiff for all overtime hours he claims to have

---

[6] Since January 1, 2008, the state minimum wage has been $8.00 per hour.  Cal. Lab. Code § 1182.12.

worked.  Defendant again argues that this claim must fail because Plaintiff was not entitled to overtime compensation.  Mot. at 23.  However, as discussed above, the Court is unable to determine at this stage whether Plaintiff was properly classified as an exempt employee.  Accordingly, the Court DENIES Defendant's Motion as to this cause of action.

**D.      Failure to Comply with Employment Wage Statement and Record Provisions**

In his fourth cause of action, Plaintiff alleges that Defendant failed to provide proper pay statements, in violation of Labor Code section 226(a), by failing to itemize the total number of hours Plaintiff worked.  Compl. ¶ 35.  Plaintiff also alleges that Defendant failed to maintain proper payroll records, pursuant to Labor Code section 1174.  *Id.* ¶ 36.  Defendant argues that this claim must fail because it kept the appropriate records.  Mot. at 23-24.  However, as discussed above, the Court is unable to determine at this stage in the proceedings whether Plaintiff was properly classified as an exempt employee, and therefore cannot determine whether Defendant properly itemized Plaintiff's hours and maintained proper payroll records.  Accordingly, the Court DENIES Defendant's Motion as to this cause of action.

**E.      Statutory Waiting Time Penalties**

In his fifth cause of action, Plaintiff alleges that Defendant failed to pay him within 72 hours of resignation, as required by Labor Code section 202.  Compl. ¶ 39.  Plaintiff contends that this claim is premised on Defendant's failure to pay him overtime.  Opp'n at 15.  Defendant argues that Plaintiff was not entitled to overtime, and thus this claim must fail.  Mot. at 24.  As discussed above, the Court is unable to determine at this stage in the proceedings whether Plaintiff was properly classified as an exempt employee.  Accordingly, the Court DENIES Defendant's Motion as to this cause of action.

**F.      Unlawful Business Practices**

Plaintiff's sixth and final cause of action alleges that Defendant's conduct constitutes unfair and unlawful business practices within the meaning of California Business and Professions Code §§ 17200 *et seq*.  Compl. ¶¶ 39-42.  The Unfair Competition Law or "UCL," section 17200 prohibits the following five different types of wrongful conduct: (1) an "unlawful . . . business act or

UNITED STATES DISTRICT COURT
For the Northern District of California

35

practice;" (2) an "unfair . . . business act or practice;" (3) a "fraudulent business act or practice;" (4) "unfair, deceptive, or untrue or misleading advertising;" and (5) "any act prohibited by [Bus. & Prof. Code §§ 17500-17577.5]." Cal. Bus. & Prof. Code § 17200. The "unlawful" prong of the UCL proscribes "anything that can properly be called a business practice and that at the same time is forbidden by law." *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 717-18 (2001) (internal quotations omitted). The "unlawful" practices prohibited by the UCL "are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory or court-made." *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994). Here, Plaintiff alleges that Defendant violated the UCL based on its conduct alleged in his other causes of action. Compl. ¶ 44.

In its Motion, Defendant argues that this claim must fail because all of the other causes of action fail. Mot. at 24. However, in his Opposition, Plaintiff states that "[b]y mis-classifying the Plaintiff and failing to pay him overtime and minimum wage, Defendant has violated the California IWC Wage Orders and the Labor code." Opp'n at 16. As discussed above, there remains a genuine question of material fact as to whether Defendant misclassified Plaintiff as exempt. Accordingly, the Court DENIES Defendant's Motion as to Plaintiff's unlawful business practices cause of action.

### CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED.**

Dated: October 4, 2013

_____
Maria-Elena James
United States Magistrate Judge

36